Congress need not draw lines within the statute with absolute precision.

### 2. Discrimination Based on Nationality

Challenging the NACARA's selective application of the stop-time rule based on an alien's national origin, Sad also asserts that such constitutionally suspect discrimination cannot withstand strict scrutiny. This contention misstates the proper standard of review. We review such classifications in immigration acts under a standard even more deferential than rational-basis review. *Fiallo*, 430 U.S. at 795 n.6 (noting Congress's plenary power over entry of aliens and recognizing the availability of only limited judicial review over such decisions); *Mathews*, 426 U.S. at 79-82. Because Congress may favor some nationalities over others when enacting immigration laws, Sad's challenge to the NACARA's exemption of some aliens but not others from retroactive application of the stop-time rule fails.

### IV.  Conclusion

For the foregoing reasons, we conclude that the stop-time rule applies to Sad's petition for suspension of deportation. Accordingly, we AFFIRM the judgment of the Board of Immigration Appeals.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0119P (6th Cir.)
File Name:  01a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RIAD SAD,

*Petitioner,*

*v.*                                              No. 99-4283

IMMIGRATION AND
NATURALIZATION SERVICE,
*Respondent.*



On Appeal from the Immigration & Naturalization Service.
No.  A22 259 911.

Submitted:  October 31, 2000

Decided and Filed:  April 17, 2001

Before:  KRUPANSKY, BATCHELDER, and GILMAN,
Circuit Judges.

———————————

### COUNSEL

**ON BRIEF:**  Noel J. Saleh, SALEH & SALLEY, Detroit, Michigan, for Petitioner.  Christopher C. Fuller, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., Matthew R. Hall, U.S. DEPARTMENT OF JUSTICE, OFFICE OF LITIGATION, Washington, D.C., for Respondent.

## OPINION

ALICE M. BATCHELDER, Circuit Judge. Riad Yacoub Sad appeals the denial of his application for suspension of deportation, arguing that proper construction of the transitional provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ("IIRIRA"), forecloses retroactive application of a stop-time rule to his application. He also challenges the rule on due process and equal protection grounds. For the reasons set forth below, we AFFIRM the judgment of the Board of Immigration Appeals.

### I. Factual and Procedural Background

Sad, a Jordanian national and citizen, entered the United States as a nonimmigrant visitor on March 5, 1989. When his temporary authorization to enter the country expired on September 4, 1989, Sad remained in the United States and settled outside Detroit. On June 7, 1995, the Immigration and Naturalization Service ("INS") served Sad with an Order to Show Cause and Notice of Hearing ordering Sad to appear before an Immigration Judge ("IJ") to show cause why he should not be deported.

Claiming extreme hardship for his wife and children, Sad sought relief from deportation by applying for suspension of deportation, one condition of which requires continuous physical presence in the United States for seven years. Under the law as it then existed, an alien could satisfy this requirement at any point after proceedings before the INS had begun. While Petitioner's application for suspension of deportation was pending, Congress overhauled the nation's immigration laws by enacting the IIRIRA. Under this regime, Congress created a "stop-time rule" pursuant to which an alien must establish continuous physical presence *prior to* the initiation of deportation or removal proceedings. The

sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety, or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Id.* at 320-21 (internal citations and quotations omitted). In the case of immigration matters, rational-basis review requires even less because of Congress's plenary power over the field. "Control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature. The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause." *Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982) (citations omitted). *See also Reno v. Flores*, 507 U.S. 292, 305 (1993) ("Over no conceivable subject is the legislative power of Congress more complete.") (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)); *Gao v. Jenifer*, 185 F.3d 548, 552 (6th Cir. 1999).

Sad may accurately describe the state of affairs under the statute. The stop-time rule, however, represents a legitimate policy choice to remove incentives to delay deportation or removal proceedings *once they have begun*. That some aliens will evade service does not implicate this rationale, *cf. Tefel*, 180 F.3d at 1299, or render the statute irrational since

level of a constitutional violation. Indeed, the order to show cause that Sad received evidently sufficed to put him on notice that the INS intended to deport him. Further, Sad has not cited, nor have we found, any authority for the proposition that the Constitution requires that aliens have a hearing specifically to challenge the sufficiency of process prior to deportation or removal. Therefore, we find no merit in this argument.

### B. The Equal Protection Dimension of Sad's Claims

Sad raises two claims under the Fifth Amendment Due Process Clause's equal protection principles. First, he claims that the BIA's application of the transitional rule irrationally discriminates against aliens based on when they received their orders to show cause or notices to appear. Second, Sad challenges the nationality-based exceptions in the NACARA to retroactive application of the stop-time rule.

### 1. Discrimination Based on Time of Service

The crux of Sad's argument that the BIA's application of the stop-time rule is irrational is that the transitional rule produces disparate results in individual cases consistent with no underlying rationale. In particular, Sad compares the case of an alien who evaded service of process for seven years and nonetheless remains eligible for cancellation of removal with an alien who accepted service but becomes ineligible because of retroactive application of the stop-time rule.

We review this claim under the rational-basis standard. *Heller v. Doe*, 509 U.S. 312 (1993), lays out the scope of a court's inquiry under this standard:

[A] legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. A State, moreover, has no obligation to produce evidence to

IIRIRA's transitional rules for handling pending cases incorporate the stop-time rule.

Applying the IIRIRA's transitional stop-time rule to Sad's application for suspension of deportation, an IJ sitting in Detroit pretermitted Sad's application on the ground that he had failed to establish physical presence in the United States for seven years prior to being served with the order to show cause. The IJ preserved Sad's challenge to the application of this rule to his case for consideration in an appropriate forum. On the authority of its interpretation of the stop-time rule in *In re Nolasco-Tofino*, Int. Dec. 3385 (BIA 1999) (en banc), the Board of Immigration Appeals ("BIA") affirmed the IJ's denial of Sad's application for suspension of deportation and dismissed his appeal. Maintaining that the statute precludes application of the stop-time rule to petitions for suspension of deportation pending at the time of the IIRIRA's enactment, Sad timely appealed.

### II. Construction of the IIRIRA's Transitional Stop-Time Rule

This case presents a question of statutory interpretation, which this court reviews de novo. *Mustata v. United States Dep't of Justice*, 179 F.3d 1017, 1019 (6th Cir. 1999). Principles of judicial deference to an agency's construction of a statute, however, limit the scope of our inquiry. In *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999), the Supreme Court determined that the doctrine of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (defining the circumstances under which courts must defer to an agency's construction of a statute), applies to the statutory scheme created by the Immigration and Nationality Act ("INA"). The Court recognized immigration matters as particularly appropriate for judicial deference because executive "officials exercise especially sensitive political functions that implicate questions of foreign relations." *Id.* at 425. Even before the Supreme Court decided *Aguirre-Aguirre*, we applied principles of judicial deference under *Chevron* to interpretation of the INA. *Hamama v. INS*, 78

F.3d 233, 239 (6th Cir. 1996). Although *Aguirre-Aguirre* and *Hamama* both involved interpretation of a statutory definition not relevant here, they announced a rule of deference applicable to most if not all of the statutory scheme created by congressional delegation to the Attorney General and the BIA to administer and apply the immigration laws. Therefore, *Chevron* principles control our review of the statute at issue here.

The threshold inquiry under *Chevron* is "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842-43. If so, the agency and the courts must give effect to the unambiguously expressed intent of Congress. *Id*. Courts may employ traditional tools of statutory construction in determining congressional intent under this threshold inquiry. *Id.* at 843 n.9. If the statute is ambiguous, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Under this secondary inquiry, the court need not conclude that the agency's construction was the only one it could have adopted or the reading a court would have reached. *Id.* at 843 n.11. If the agency's construction is permissible, it controls unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

### A.  The Transitional Stop-Time Rule

Prior to enactment of the IIRIRA, aliens facing deportation could apply for "suspension of deportation" if they satisfied three conditions. INA § 244(a)(1), 8 U.S.C. § 1254(a)(1) (1994). One of these conditions required the applicant to demonstrate continuous physical presence in the United States for seven years. *Id.* Satisfying all three conditions, however, did not entitle an alien to suspension of deportation. Rather, the Attorney General in his discretion could grant the relief. Deportation proceedings began under the INA when the INS served an alien with an order to show cause. During the pendency of proceedings, aliens continued to accrue time toward the physical presence requirement. Therefore, aliens

Congress has not expressly or precisely demarcated its proper temporal reach. Second, without such an express command, we must determine whether the statute has retroactive effect. *Id*. By retroactive effect, the Court means "whether [a statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id*. The discretionary nature of the relief sought concludes the retroactivity inquiry. Because *Landgraf* treats retroactivity as turning on the impairment of rights a party possessed prior to enactment of the statute at issue, the stop-time rule cannot have retroactive effect. Prior to enactment of the IIRIRA, Sad possessed no right to suspension of deportation, which the Attorney General may grant in his discretion, and without retroactive effect the presumption against retroactivity will not operate. *Appiah*, 202 F.3d at 709. This result accords with the Supreme Court's understanding that statutes do not operate retroactively merely because applied to cases arising from actions preceding the statute's enactment. *Landgraf*, 511 U.S. at 269.

Sad raises the potentially unconstitutional effect of denying aliens a hearing on the sufficiency of process as an additional argument that the BIA's interpretation of the stop-time rule violates due process. Pointing out that aliens frequently admit service of process because they believe they will qualify for suspension of deportation, Sad maintains the effect of the stop-time rule is to change the legal significance of an order to show cause since its service under the transitional rule pretermits the application for suspension of deportation. In other words, thinking that he can apply for suspension of deportation, an alien will not challenge the sufficiency of process. Once the stop-time rule applies, however, the BIA will not even consider whether the alien qualifies for suspension, and the alien has lost the opportunity to challenge the sufficiency of process. In his own case, Sad has not pointed to any defect in the service of process that rises to the

deportation proceedings. *Cuadras v. INS*, 910 F.2d 567, 573 (9th Cir. 1990). Here, Sad received a hearing before an IJ and pursued an appeal to the BIA. Rather than contest the fairness of either proceeding, he challenges the pretermission of his application for suspension of deportation.

Under immigration law prior to enactment of the IIRIRA, as it exists today as amended by the NACARA, and as it applies to cases in the transitional period, the Attorney General may grant applications for suspension of deportation (or cancellation of removal) to qualifying aliens in his sole discretion. The decision to grant an application, then, amounts to "an act of grace." *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996). Even if an alien satisfies the conditions to qualify for relief, the Attorney General retains discretion to grant or deny the application. *Babai v. INS*, 985 F.2d 252, 253 (6th Cir. 1993) (citing *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985)). Sad's expectation at the time the INS served him with an order to show cause that he would have an opportunity to apply for suspension of deportation "does not equate with liberty or property, and a constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award." *Tefel*, 180 F.3d at 1300 (citing *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)). Therefore, due process at most affords Sad the right to the hearing he had as part of the deportation proceeding and, because he possesses no liberty or property interest in suspension of deportation, application of the stop-time rule does not unconstitutionally interfere with Sad's rights.

Nor does the transitional stop-time rule retroactively interfere with whatever expectations Sad might have had regarding the proceeding. In *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), the Supreme Court established a two-step inquiry in cases implicating federal statutes enacted after the events in controversy. First, we examine "whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. Because we resolve interpretation of the statute by deferring to the BIA under *Chevron*, we also conclude that

could become eligible for suspension of deportation during the course of administrative proceedings before the INS.

The IIRIRA amendments to the INA altered this framework. Congress replaced "deportation" with a procedure called "removal." IIRIRA § 304, 8 U.S.C. § 1229a. In addition, the IIRIRA substituted "suspension of deportation" with a more limited form of discretionary relief known as "cancellation of removal," which contains additional eligibility requirements. IIRIRA § 304(a), 8 U.S.C. § 1229b. For purposes of this case, the most significant change effected by the IIRIRA concerns the creation of the stop-time rule. Rather than allowing aliens to continue accruing time toward the physical presence requirement once administrative proceedings commenced, as happened under the INA, the IIRIRA terminates the accrual of time toward the physical presence requirement when the INS serves an alien with a "notice to appear," a document that the IIRIRA created and that operates like an order to show cause under the INA. Hence, under the IIRIRA framework, an alien can no longer accumulate time toward satisfaction of the continuous physical presence requirement after the INS initiates removal proceedings. The change from a deportation to a removal system had an effective date, the "title III-A effective date," of April 1, 1997.

The IIRIRA contains transitional rules to govern cases pending as of the September 3, 1996, date of the IIRIRA's enactment. Section 309 of the IIRIRA contains the relevant transitional rules the INS applied in Sad's case:

(c)  **Transition for Aliens in Proceedings.**

(1)  **General Rule that New Rules Do Not Apply.** Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion proceedings as of the title III-A effective date —

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

\* \* \*

**(5) Transitional Rule with regard to Suspension of Deportation.** Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to *notices to appear issued before, on, or after* the date of the enactment of this Act.

IIRIRA § 309 (emphasis added). Section 240A(d)(1) of the INA, referenced in this section, contains the new stop-time rule and provides:

**(d) Special Rules relating to Continuous Residence or Physical Presence**

  **(1) Termination of Continuous Period.** For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served *a notice to appear.*

INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1) (emphasis added). Therefore, because section 309(c)(5) embodies an express exception to the general rule of nonapplicability contained in section 309(c)(1)(A), this transitional rule attempts to apply the stop-time rule to pending applications for suspension of deportation. Because "notices to appear" did not exist prior to the effective date of the IIRIRA, however, section 309(c)(5) presents a facial ambiguity: either "notices to appear" encompasses orders to show cause or the reference to notices to appear "issued before" the effective date of the IIRIRA is an error in drafting. Additionally, section 240A employs the terminology of the new removal regime while the transitional rule attempts to apply it to deportation proceedings initiated by orders to show cause. In other

*Tofino* merits deference if based on a permissible construction of the statute. "The BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *Aguirre-Aguirre*, 526 U.S. at 425 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987)). Sad has presented no argument that the BIA interpretation is impermissible other than that it is inconsistent with the plain meaning of the statutory language as he construes it. Indeed, that the BIA, this court, and several other circuits have accepted a differing reading suggests that the statutory language may not be quite so lucid as Sad contends. At most, Sad's proposed reading of the statute points to and relies on ambiguities in its language. In such circumstances, we must defer to the permissible interpretation offered by the BIA. Nor has Sad argued that the BIA's interpretation or application of the stop-time rule to his case is arbitrary or capricious.

### III. Sad's Constitutional Arguments

Sad contends that the BIA's application of the statute to his application for suspension of deportation violates the Fifth Amendment's Due Process Clause because it impermissibly and retroactively interferes with vested property and liberty interests. Additionally, Sad contends that the BIA's interpretation of the statute arbitrarily and irrationally discriminates between similarly situated aliens in violation of the equal protection component of the Clause.

#### A. The Procedural Due Process Claim

Although Sad correctly asserts that the Due Process Clause protects even aliens illegally in this country, *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)), aliens illegally in the United States do not have a fundamental right to remain. *Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 (1952); *Shaar v. INS*, 141 F.3d 953, 958 (9th Cir. 1998). Nonetheless, the proceedings by which the federal government removes such aliens are subject to constitutional limitations. *Mathews*, 426 U.S. at 77. Due process requires a "full and fair hearing" in

orders to show cause to section 309(c)(5) did not make a similar change in section 240A(d) and so the stop-time rule cannot apply to Sad's application for suspension of deportation. Under this reading, the transitional rule of section 309(c)(2) of the IIRIRA embodies the limits of the stop-time rule's retroactive application. Section 309(c)(2) offers the Attorney General the option of proceeding with pending cases, the processing of which had not commenced as of April 1, 1997, under the new statutory regime. In this case, Sad posits, an alien would be ineligible for suspension of deportation because such relief no longer exists under the IIRIRA, but could seek cancellation of removal under section 240A. Then, section 240A(d)(1) requires that the alien's period of continuous physical presence stop accruing upon service of the order to show cause that initiated proceedings. In response, the INS accepts Sad's reading as a potentially valid interpretation of the transitional rules, but asserts that the stop-time rule is not limited only to pending cases in which the Attorney General elects to apply the new procedures and substantive legal standards of the IIRIRA. Because these provisions credibly admit of multiple interpretations, we cannot say under *Chevron's* threshold inquiry that the transitional rules of the IIRIRA as amended by the NACARA are unambiguous.

We next ask whether the agency's construction of the statute is permissible. There is no question that the BIA's interpretation of the statute controls for *Chevron* purposes. Prior to the enactment of the IIRIRA, Congress had delegated to the Attorney General discretionary authority to make determinations regarding applications for suspension of deportation. INA § 244(a)(1), 8 U.S.C. § 1254(a)(1) (1994). Creation of the new removal regime did not alter this framework. INA § 240A(a), 8 U.S.C. § 1229b(a) ("The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States" if certain conditions are met). The Attorney General has delegated this authority to the BIA. 8 C.F.R. § 3.1(d)(1) (2000). Therefore, for purposes of the *Chevron* analysis, the BIA's interpretation of the stop-time rule in *In re Nolasco-*

words, the transitional rule applies the stop-time rule to pending cases initiated by a notice to appear prior to the IIRIRA's effective date even though notices to appear did not initiate administrative proceedings until after the IIRIRA's effective date.

The BIA addressed this interpretative dilemma in *In re N-J-B-*, Int. Dec. 3309 (BIA 1997) (en banc), by broadly construing "notices to appear" in section 309(c)(5) to encompass other documents, including orders to show cause, initiating deportation or removal proceedings. Under this interpretation, aliens who failed to satisfy the physical presence requirement prior to being served with an order to show cause became ineligible for suspension of deportation. The Attorney General vacated *N-J-B-* and certified the case to herself for review. Att'y Gen. Order No. 2093-97 (July 10, 1997). Before she could review the decision, however, Congress enacted the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2160 (1997) ("NACARA"), as a "clarifying amendment" to the IIRIRA. The NACARA amended the stop-time rule by replacing "notices to appear" in section 309(c)(5) with "orders to show cause" and making this amendment effective as if included in the IIRIRA. NACARA § 203(a) and (f). After the amendment, then, the IIRIRA's transitional rule regarding suspension of deportation now reads as follows:

> **(5) Transitional Rule with regard to Suspension of Deportation.** *Subject to paragraphs (B) and (C)*, paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to *orders to show cause (including those referred to in section 242B(a)(1) of the Immigration and Nationality Act as in effect before the title III-A effective date)*, issued before, on, or after the date of the enactment of this Act.

NACARA § 203(a)(1) (new language in italics). Section 242B of the INA, parenthetically referenced, was codified at

8 U.S.C. § 1252b and simply contains the provisions regarding the contents of orders to show cause. The initial "subject to" clause creates two exceptions to the retroactive application of the amended transitional rule. First, Congress clarified that if the Attorney General chooses to terminate deportation proceedings and reinstate removal proceedings, the stop-time rule does not apply. NACARA § 203(a)(1). This clarification changes the default rule under the general transitional rules for aliens already in proceedings that the stop-time rule applies when the Attorney General terminates then reinitiates proceedings. IIRIRA § 309(c)(1) and (3). In such cases, an alien who had been served with an order to show cause would have an opportunity to apply for cancellation of removal. Second, the NACARA exempted certain aliens from Nicaragua, Guatemala, and Eastern Europe from application of the stop-time rule in all circumstances. NACARA § 203(a)(1). The NACARA only amended the IIRIRA transitional rule and did not change the language of the stop-time rule itself found in section 240A(d).

In *In re Nolasco-Tofino*, Int. Dec. 3385 (BIA 1999) (en banc), the BIA considered whether the IIRIRA's transitional rule as amended by the NACARA applies the stop-time rule to pending applications for suspension of deportation when calculating an alien's continuous physical presence in the United States. Finding the revised language of the transitional rule to be unambiguous, the majority decided that the stop-time rule applies to all pending deportation proceedings unless an alien satisfies one of the express statutory exemptions. *Id.* Three of the BIA's sixteen members concurred separately. Agreeing that the majority's reading of the statute was reasonable, they noted that its language was not plain on its face and unambiguous because of the incongruity of the terminology employed by the stop-time rule in section 240A(d)(1) of the INA and by the transitional rule in section 309(c)(5) of the IIRIRA as amended by the NACARA. *Id.*

## B.  Application of Chevron

The threshold consideration under *Chevron* is "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842-43. If so, the agency and the courts must give effect to the unambiguously expressed intent of Congress. *Id.* Respondent argues that the stop-time rule as amended unambiguously applies the stop-time rule to pending applications for suspension of deportation, obviating the need for further inquiry. Recently, panels of this court examined the issue and accepted this argument. *Bartoszewska-Zajac v. INS*, 237 F.3d 710, 713 (6th Cir. 2001); *Ashki v. INS*, 233 F.3d 913, 918-19 (6th Cir. 2000). Likewise, other circuits have found the statutory language as amended clear on its face. *Escudero-Corona v. INS*, ___ F.3d ___, 2001 WL 277743, at *4 (8th Cir. Mar. 22, 2001); *Ram v. INS*, 243 F.3d 510, 2001 WL 253195, at *5 (9th Cir. Mar. 15, 2001); *Rojas-Reyes v. INS*, 235 F.3d 115, 121 (2d Cir. 2000); *Angel-Ramos v. Reno*, 227 F.3d 942, 947 (7th Cir. 2000); *Afolayan v. INS*, 219 F.3d 784, 788 (8th Cir. 2000); *Rivera-Jimenez v. INS*, 214 F.3d 1213, 1217 (10th Cir. 2000) (per curiam); *Gonzalez-Torres v. INS*, 213 F.3d 899, 903 (5th Cir. 2000); *Appiah v. INS*, 202 F.3d 704, 708-09 (4th Cir.), *cert. denied*, 121 S. Ct. 140 (2000); *Tefel v. Reno*, 180 F.3d 1286, 1293 (11th Cir. 1999), *cert denied*, 120 S. Ct. 2657 (2000).

No court has addressed the merits of Sad's proposed interpretation of the transitional rules, the plausibility of which the INS concedes. His reading builds on the observation of the concurring members of the BIA in *In re Nolasco-Tofino* that, even as amended, the transitional rules for applying the stop-time rule to pending applications for suspension of deportation mediate imperfectly between two different statutory regimes. Sad points out that the amended transitional rule in section 309(c)(5) by its own terms references the stop-time rule in section 240A(d), which in turn terminates the accrual of time toward satisfaction of the continuous physical presence requirement only when the INS serves an alien with a "notice to appear." INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1). The NACARA amendment adding