*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0015P (6th Cir.)
File Name: 01a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TERESA BARTOSZEWSKA-
ZAJAC,

               *Petitioner*,

      *v.*

IMMIGRATION AND
NATURALIZATION SERVICE,
         *Respondent*.

No. 99-4430

On Petition for Review of an Order from the Board of
Immigration Appeals.
No. A29-652-970.

Argued: October 31, 2000

Decided and Filed: January 12, 2001

Before: MERRITT and SILER, Circuit Judges; SARGUS,
District Judge.

———————————

*The Honorable Edmund A. Sargus, Jr., United States District Judge
for the Southern District of Ohio, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:** Joel A. Perlmutter, Cleveland, Ohio, for Petitioner. Susan K. Houser, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Respondent. **ON BRIEF:** Joel A. Perlmutter, Cleveland, Ohio, for Petitioner. Susan K. Houser, Richard M. Evans, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Respondent.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge. In this unfortunate immigration case, petitioner does not dispute that she is deportable. She instead seeks suspension of deportation, a type of discretionary relief conditioned on, among other criteria, continuous presence in this country. The Board of Immigration Appeals found her ineligible because she could not show the requisite seven years' stay. The Board calculated petitioner's time in residence based upon immigration provisions enacted while her case was pending. Petitioner now contends that these legislative changes unconstitutionally deprived her of the opportunity to apply for suspension of deportation. We find that Congress intended the retroactive reach of the law and that its classification scheme is rationally related to legitimate federal interests. We therefore affirm.

## I. Facts

Mrs. Teresa Bartoszewska-Zajac was nearly 18 years old when she entered this country on February 18, 1989. As a nonimmigrant tourist visitor, she was admitted for six months. She has never requested an extension of stay and has never applied for asylum. She married another Polish

*Ashki*, 233 F.3d at ___, 2000 U.S. App. LEXIS 30456, at *15-16 (footnote omitted). The other circuits that have considered equal protection challenges to the Nicaraguan Act have come to the same conclusion. *See Angel-Ramos v. Reno*, 227 F.3d 942 (7th Cir. 2000) (rejecting the equal protection claim of a Mexican petitioner); *Afolayan v. INS*, 219 F.3d 784 (8th Cir. 2000) (rejecting the equal protection claim of Nigerian petitioners); *Appiah v. INS*, 202 F.3d 704 (4th Cir. 2000), *cert. denied*, ___ U.S. ___, 121 S.Ct. 140 (2000) (rejecting the equal protection claim of a Ghanian petitioner).

### III. Conclusion

Suspension of deportation is strictly discretionary. *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996) (describing the Attorney General's suspension of deportation as "an act of grace" which is accorded pursuant to her "unfettered discretion") (quoting *Jay v. Boyd*, 351 U.S. 345, 354 (1956)). In this case, the Board of Immigration Appeals denied relief because petitioner did not satisfy the time-in-residence requirement. The Court, however sympathetic, does not enjoy any discretion in rendering judgment according to Congress' clear mandate. The decision is AFFIRMED.

national here in 1993. She now has two children, both born in and citizens of the United States.

The Immigration and Naturalization Service (INS) served petitioner with an order to show cause on August 24, 1994, initiating deportation proceedings. She then had been in the United States for five and a half years. At that time, foreign nationals could apply for discretionary relief by showing hardship, good moral character, and continuous physical presence in the United States for at least seven years. *See* 8 U.S.C. § 1254(a) (1994) (repealed 1996). Applicants facing expulsion could accumulate the statutory seven years even during deportation proceedings. On May 20, 1996, Mrs. Bartoszewska-Zajac filed a Motion to Reopen. Before a hearing could be held on her petition, however, Congress changed the law concerning discretionary relief.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("the Illegal Immigration Act" or "IIRIRA") made sweeping revisions of immigration policy. Pub. L. No. 104-208, 110 Stat. 3009, 546-724 (1996) (codified as amended in scattered sections of 8 U.S.C.). Section 309(c)(5) is an important exception to the prospective reach of the Act, setting forth a transitional rule for pending cases. Petitioner falls in this class. Under the new law, continuous residence ends when the foreign national is served with an INS charging document. This "stop-time" rule prevents a foreign national from accumulating the seven years' physical presence during deportation proceedings. It applies whether the charging document was issued before or after passage of the Illegal Immigration Act. Illegal Immigration Act § 309(c)(5).

Immigrant communities protested that the new law unfairly subjected them to higher standards for discretionary relief. In response, Congress passed the Nicaraguan Adjustment and Central American Relief Act of 1997 ("the Nicaraguan Act" or "NACARA"). Pub. L. No. 105-100, 111 Stat. 2160, 2193-2201 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997). This law lifted the stop-time bar for certain

foreign nationals, allowing them to accrue seven years' presence even during deportation proceedings. Nationals of Eastern Europe and the former Soviet Union qualified under the 1997 law if they had filed for asylum on or before December 31, 1991.

## II.  Discussion

The Board of Immigration Appeals found petitioner ineligible for relief under its interpretation of the 1996 and 1997 laws. We review this legal determination *de novo*. *Kabongo v. INS*, 837 F.2d 753, 756 (6th Cir. 1988). We must decide whether the stop-time rule of § 309(c)(5) of the Illegal Immigration Act is unconstitutionally retroactive in violation of due process. We also must decide whether this provision, as well as § 203(a)(1) of the Nicaraguan Act, violate equal protection principles. In interpreting these immigration provisions, we are guided by our recent decision in *Ashki v. INS*, which addressed similar statutory and constitutional claims. *Ashki v. INS*, 233 F.3d 913, 2000 U.S. App. LEXIS 30456 (6th Cir. Dec. 4, 2000).

### A.  Retroactivity of the Illegal Immigration Act

Basic principles of fairness and notice underlie a judicial skepticism of statutory retroactivity. *Landgraf v. USI Film Products*, 511 U.S. 244, 272 (1994). The judicial presumption against retroactivity can be overcome, however, when Congress clearly intends that result. *Id*. at 268. Here, Congress plainly intended that the stop-time section of the Illegal Immigration Act be retroactive, excepting it from otherwise forward-looking provisions. Section 309(c)(5) of the Act, entitled "Transitional Rule with Regard to Suspension of Deportation," provides that the stop-time rule "shall apply to notices to appear issued before, on, or after the date of the enactment of this Act." At the time of its passage, however, the language of this section was anachronistic. As first enacted, the provision applied to "notices to appear." That term came into effect only as a result of the 1996 Act. Before then, the INS charging document was the "order to show cause." To clarify, Congress later revised the stop-time

rational basis, may distinguish between classes of aliens, and confer benefits on one or more classes that are not available to others." *Newton*, 736 F.2d at 339 (internal citations omitted).

Here, Congress sought to help foreign nationals fleeing violence and unrest. It did not relieve those who had never filed for asylum, excluding Poles such as petitioner who came to this country to improve their economic status rather than escape persecution. The Immigration and Naturalization Service need not elucidate the true intent of Congress to justify this grouping. "Rational basis review does not require us to identify the legislature's actual rationale for the distinction; rather, we will uphold the statute if 'there are plausible reasons for Congress' action.'" *Hamama v. INS*, 78 F.3d 233, 237 (6th Cir. 1996) (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Presumably, Congress recognized that those most deserving of the Act's largesse would be nationals who had filed for asylum. Though the Act's ameliorative provisions do not apply in petitioner's case, we recognize that Congress had a rational basis for making such distinctions. In *Ashki*, we acknowledged that the Nicaraguan Act produced uneven treatment among national groups. Nevertheless, we found that the statutory distinctions satisfied our rational basis review. As we explained,

> Although the NACARA exemptions clearly do not cover all aliens who will face hostile conditions in their homelands, this fact does not make these exemptions irrational. There are a myriad of political and foreign policy reasons that might explain why aliens from certain nations were initially encouraged to stay in the U.S. and later exempted from the stop time provision and other aliens were not. Petitioner has offered no evidence that the Congressional exemptions were irrational or that they were based on an impermissible motivation. Therefore, this court will not second guess the line that Congress has drawn.

S.Ct. 2657 (2000) (denying an equal protection challenge to the stop-time provision).

Second, petitioner claims that the 1997 amendments violate equal protection because they remove the stop-time bar for only certain foreign nationals. Nicaraguan Act § 203(a)(1), amending § 309(c)(5) of the Illegal Immigration Act. Among other eligible classes, Poles who filed for asylum on or by December 31, 1991, could still accrue time in residence towards the requisite seven years, even during deportation proceedings. Though a native of Poland, Mrs. Bartoszewska-Zajac is not eligible under this provision because she never applied for asylum. She came to the United States for a "better quality of life." Reply Br. of Pet'r at 10. Seeking economic opportunity rather than political refuge, petitioner "did not file for asylum[] because it was and still is inappropriate. She easily could have filed, but was honest enough not to file." *Id.* In contrast, petitioner notes, Poles who filed weak, frivolous, or unsuccessful asylum petitions *would* be eligible under the Nicaraguan Act. Petitioner claims that this is an unconstitutional distinction.

Congress passed the Nicaraguan Act to help refugees from civil war and the fall of Communism. *See* SENATE EXPLANATORY MEMORANDUM REGARDING TITLE II OF THE D.C. APPROPRIATIONS BILL, 143 CONG. REC. S12266 (1997), *available at* 1997 WL 693186. As petitioner suggests, its provisions fall short of blanket relief for all similarly situated groups, placing restrictions on some nationals but not on others. Congress, however, was aware of this disparity. *See, e.g.*, 143 CONG. REC. S12264 (Nov. 9, 1997) (statement of Sen. Kennedy) ("[I]nstead of correcting the injustice for all refugees, Republicans now propose to pick and choose among their favorite Latino groups . . . ."). Absent irrational classifications, however, we defer to Congress to make distinctions at our nation's borders. "Congressional power to draw lines with respect to what classes of aliens will be admitted to the United States, and the conditions of such admission, is subject only to limited judicial review . . . . Moreover, the exercise of such power, if predicated on a

provision to include "orders to show cause." Nicaraguan Act § 203(a)(1), *amending* § 309(c)(5) of the Illegal Immigration Act. That Congress would amend the transitional rule, tailoring it specifically to pre-1996 nomenclature, indicates its retroactive design.

The Board of Immigration Appeals has previously concluded that the stop-time rule applies to suspension of deportation cases. *In re Nolasco-Tofino,* Interim Decision 3385 (BIA 1999) (en banc), *available at* 1999 WL 261565. We generally defer to the Board's interpretation of immigration statutes. *INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-25 (1999) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). Here, that deference is well-founded. Congress changed the law precisely to prevent accumulation of statutory time during deportation proceedings, removing the incentive for delay. *See* H.R. REP. NO. 104-879, at 108 (1997). We must follow this clear directive. *See Landgraf*, 511 U.S. at 280 ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules.").

In *Ashki v. INS*, we first considered the effect of these changes in immigration law. *Ashki v. INS*, 233 F.3d 913, 2000 U.S. App. LEXIS 30456 (6th Cir. Dec. 4, 2000). In that case, we concluded that an Iranian citizen could not reopen her deportation proceedings for the purpose of applying for relief because she had not fulfilled the time-in-residence requirement. Rejecting a due process challenge to the Nicaraguan Act, we stated that petitioner could not claim a constitutionally protected interest in securing discretionary relief. *Id.* at ___, 2000 U.S. App. LEXIS 30456, at *17. Moreover, as a matter of statutory construction, we determined that the 1997 Act specifically gave stop-time effect to show cause orders issued before the Illegal Immigration Act. *Id.* at ___, 2000 U.S. App. LEXIS 30456, at *8.

In following *Ashki*, we also note the several other circuits that have upheld the retroactive reach of the stop-time provision.  *See Rojas-Reyes v. INS*, No. 99-4131, ___ F.3d ___, 2000 U.S. App. LEXIS 33206 (2d Cir. Dec. 15, 2000); *Angel-Ramos v. Reno*, 227 F.3d 942 (7th Cir. 2000); *Afolayan v. INS*, 219 F.3d 784 (8th Cir. 2000); *Rivera-Jimenez v. INS*, 214 F.3d 1213 (10th Cir. 2000); *Appiah v. INS*, 202 F.3d 704 (4th Cir. 2000), *cert. denied*, ___ U.S.___, 121 S.Ct. 140 (2000); *Gonzalez-Torres v. INS*, 213 F.3d 899 (5th Cir. 2000); *Tefel v. Reno*, 180 F.3d 1286 (11th Cir. 1999), *cert. denied*, ___ U.S.___, 120 S.Ct. 2657 (2000). This array of persuasive authority confirms our interpretation of the stop-time provision in *Ashki* and admits of only one outcome here.  The Board properly concluded that petitioner's period of continuous presence ended on August 24, 1994, when she was served with an order to show cause.[1]  Though in petitioner's case the stop-time rule bars her from relief, Congress plainly intended this result by discouraging strategic delay during deportation proceedings. *See Ashki*, 233 F.3d at ___, 2000 U.S. App. LEXIS 30456, at *16 n.2.  Neither this legislative purpose nor the provision enacted to carry it out offends due process. *See Hamama v. INS*, 78 F.3d 233, 236 (6th Cir. 1996) ("We agree that the requirements of due process are satisfied if retroactive application of federal immigration legislation is rationally related to a legitimate government purpose;  the courts have deferred in the past to immigration legislation at least as much as they have deferred to economic legislation.").

## B.  The Equal Protection Challenges

In matters of immigration, equal protection challenges warrant very deferential review. *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976) ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area

---

[1] We do not decide today whether petitioner could accrue the requisite seven years in a period of continuous presence starting *after* August 24, 1994.

of immigration and naturalization.") (footnotes omitted).  Of course, that deference is not unquestioning. *See, e.g., Francis v. INS*, 532 F.2d 268 (2d. Cir. 1976) (finding that discretionary relief conditioned on "irrelevant and fortuitous factors" violated equal protection).  In this Circuit, "[t]he role of the courts in analyzing an equal protection challenge to a federal immigration statute is limited to determining whether the statute at issue is conceivably related to the achievement of the federal interest." *Almario v. INS*, 872 F.2d 147, 152 (6th Cir. 1989) (citation omitted).

Petitioner makes two equal protection arguments.  First, petitioner claims that imposition of the stop-time rule to pending cases creates two classes of foreign nationals seeking suspension of deportation.  Nationals who evaded immigration authorities for seven years can apply for relief, she contends, while those served before their seventh year are now ineligible.  This argument is unpersuasive.  In 1996, Congress intended to expedite the removal of foreign nationals illegally present in this country.  It recognized that permitting nationals to accumulate time in residence during deportation only invited delay. *See* H.R. REP. NO. 104-469, at 122 (1996) ("Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued.").  Removing this incentive is a legitimate government interest.  To effectuate it, Congress sought a clear-cut terminus of continuous presence.  Service of the INS charging document provides notice to the foreign national and initiates removal proceedings.  This is a reasonable point to end physical presence.  Applying the rule to pending petitions only furthers the goal of discouraging delay in a greater number of cases.  Under our deferential review, that is all we require. *See Newton v. INS*, 736 F.2d 336, 342 (6th Cir. 1984) (describing, in an equal protection challenge to an adjustment of status case, that "it is not necessary for Congress to have drawn the line at the (purportedly) most reasonable point . . . but only that it had a rational purpose in drawing the line(s) as it did"). *Accord Tefel v. Reno*, 180 F.3d 1286, 1299 (11th Cir. 1999), *cert. denied*, ___ U.S.___ , 120