**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 14 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ELIAKIM SIBANDA, SIKHATHELE
SIBANDA, NOMAQHAWE
SIBANDA, and MTHABISI
SIBANDA,

    Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,

    Respondent.

No. 97-9512

_____

**PETITION FOR REVIEW OF AN ORDER OF THE**
**BOARD OF IMMIGRATION APPEALS**
**(BIA File Nos. A27 935 730; A27 935 729; A27 935 728; A27 935 727)**

_____

L. Ari Weitzhandler, Denver, Colorado, for Petitioners.

John J. Andre, Attorney (Stuart E. Schiffer, Acting Assistant Attorney General;
Mark C. Walters, Assistant Director; Kristen A. Giuffreda, Senior Litigation
Counsel; Paul D. Kovac, and Loreto S. Geisse, Attorneys, on the briefs) Office of
Immigration Litigation, Civil Division, Department of Justice, Washington, D.C.,
for Respondent.

_____

Before **SEYMOUR**, **McKAY**, and **MURPHY**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

Eliakim Sibanda, Sikhathele Sibanda, Nomaqhawe Sibanda, and Mthabisi Sibanda (Petitioners) appeal the Board of Immigration Appeals' (Board) February 26, 2001, ruling denying Petitioners' request to reopen their deportation proceedings in order to apply for suspension of deportation relief.

## I. Dispute Background

Because an analysis of Petitioners' claims requires an understanding of their extensive attempts to remain in the United States, we begin with a brief summary of the history of Petitioners' dealings with various immigration authorities. Petitioners' supplemental brief serves as the primary source of the current dispute's history as detailed below. See Pet. Supp. Brief 1-3.

Petitioners are natives and citizens of Zimbabwe. Eliakim first entered the United States in 1985 on a nonimmigrant visa. After his nonimmigrant visa expired, Eliakim left the United States briefly and obtained a student visa. Eliakim reentered the United States as a student in September 1987. Meanwhile, Eliakim's wife, Sikhathele Sibanda, and his two children, Nomaqhawe and Mthabisi, first entered the United States on April 30, 1986, as nonimmigrant dependents of a student.

Instead of leaving the United States when required by their visas, Petitioners applied for asylum with the Immigration and Naturalization Service on March 10, 1988. The INS denied Petitioners' request for asylum and granted

them thirty days voluntary departure in October 1988. On March 2, 1989, the INS issued an order to show cause and notice of hearing which was served on Petitioners' counsel on March 8, 1989. In May 1989, the INS administrative law judge denied Petitioners' application for asylum and granted them voluntary departure through August 12, 1989. Petitioners appealed that decision to the Board. On October 1, 1993, the Board dismissed Petitioners' appeal and granted Petitioners voluntary departure for thirty days. In September 1994, this court dismissed Petitioners' petition for review of the Board's decision. See Sibanda v. INS, 1994 U.S. App. Lexis 26980 (10th Cir.).

In March 1995, the United States District Court for the District of Colorado granted Petitioners' habeas corpus petition and allowed Petitioners an additional one-year period for voluntary departure. See Sibanda v. District Director, 881 F. Supp. 1494 (D. Colo. 1995). On March 20, 1996, Petitioners filed a motion to reopen with the Board for consideration of their applications for Suspension of Deportation. On March 3, 1997, the Board denied Petitioners' request holding that Petitioners did not qualify for Suspension of Deportation proceedings as a matter of law because they could not establish the requisite seven-year residency requirement. On March 21, 1997, Petitioners appealed to this court. On August 4, 1997, we stayed the proceedings pending the Attorney General's decision in In re N-J-B-, Int. Dec. 3309 (BIA 1997). Then on March 23, 2000, we

remanded the record to the Board for a determination whether the stop-time rule applied to Petitioners' motion. The Board on February 26, 2001, found Petitioners ineligible for suspension of deportation relief. Petitioners now seek review of the Board's denial of Petitioners' motion to reopen. We have jurisdiction to review the Board's decision pursuant to Section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

## II.  IIRIRA

Prior to IIRIRA's passage in 1996, § 244(a) of the Immigration and Nationality Act (INA) controlled suspension of deportation relief. While the Attorney General possessed discretion to grant suspension of deportation to aliens under the INA, an alien was first required to satisfy several requirements including being "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application." 8 U.S.C. § 1254(a)(1). Under the INA, time spent in deportation proceedings counted toward the seven-year physical presence requirement.

IIRIRA changed the accumulation of continuous residence time during deportation proceedings by enacting a cancellation of removal provision. See 8 U.S.C. § 1229b. Under IIRIRA, "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . .

-4-

when the alien is served a notice to appear . . . ." 8 U.S.C. § 1229b(d)(1). After IIRIRA's passage, once deportation proceedings commenced, the continuous presence "clock" stopped and an alien's ability to continue accruing years of continuous presence ended. See, e.g., Appiah v. INS, 202 F.3d 704, 707 (4th Cir. 2000).

Congress' enactment of the Nicaraguan Adjustment and Central American Relief Act (NACARA) removed any potential confusion over whether the use of the phrase "notice to appear" applied to aliens like Petitioners who were served with "orders to show cause" (instead of "notices to appear"). NACARA contained a clarifying amendment to IIRIRA's stop-time rule which substituted the phrase "orders to show cause" for IIRIRA's original "notice to appear" language.

Section 309(c)(5) of the NACARA amendments to IIRIRA established transitional rules applicable to aliens like Petitioners who were placed in deportation proceedings before April 1, 1997 (IIRIRA's effective date). While such aliens would ordinarily not be subject to IIRIRA's amendments, § 309(c)(5) indicates that the stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." IIRIRA §309(c)(5) as amended by NACARA §203(a)(1). Thus, the stop-time rule unambiguously applies to orders to show cause issued before, on, or after September 30, 1996.

As previously indicated, INS issued an order to show cause to Petitioners on March 2, 1989.

### III. Petitioners' Claims

Petitioners argue that the stop-time provision in the transitional rules cannot possibly apply to all orders to show cause issued before, on, or after IIRIRA's enactment date. Petitioners claim that this would require us to overturn cases that became final prior to IIRIRA's enactment date. Since such a result would be absurd, Petitioners argue that Congress only intended that certain individuals served with orders to show cause before, on, or after September 30, 1996, be subjected to the stop-time rule. Instead of applying to all individuals, Petitioners propose that the transitional rules should be inapplicable to aliens who took "affirmative steps," such as filing for asylum. Under Petitioners' view, the transitional rules would be applicable only to aliens filing "defensive" petitions, *i.e.*, illegal aliens discovered by INS who respond to INS' efforts to deport them by filing applications for suspension of deportation.

The superficial appeal of Petitioners' proposed application of the stop-time rule dissipates upon deeper analysis. Petitioners correctly note that the language Congress employed makes the stop-time measure universally applicable to orders to show cause issued before, on, or after IIRIRA's enactment date. It is also true, as Petitioners state, that including language indicating that the transitional rules

applied only to pending cases would have made congressional intent crystal clear. Even though Congress failed to include such language, the end result is not the ambiguity Petitioners necessarily depend upon to reach their desired result.

In dismissing Petitioners' argument, we begin with the observation that the failure to obtain optimum clarity in legislative language cannot create an ambiguity in construction requiring results contrary to Congress' manifest intent. We have never held Congress to this level of scrutiny. It is doubtful that any legislative body, Congress included, could possibly withstand a requirement that all legislative language be expressed with optimum clarity.

Due to the longstanding regard in this Country for the concept of finality, a more logical line to draw would be to apply the transitional rules only to pending cases. When contemplating the scope of the transitional rule, it is logical to assume that Congress concerned itself only with cases that were pending or would arise in the future rather than cases that had already been resolved.

Perhaps more importantly, distinguishing between aliens who take "affirmative steps" and those who respond defensively to INS proceedings finds no basis in the record or in legislative history. Petitioners fail to cite a single source supporting their proposed interpretation. Accordingly, we must reject Petitioners' suggested approach.

Regardless of the language of the transitional rules, Petitioners next argue

that the Supreme Court's decision in INS v. St. Cyr, 533 U.S. 289 (2001), mandates a reversal of the Board's decision. In St. Cyr, the Supreme Court refused to apply IIRIRA retroactively to prevent discretionary relief for an alien who pleaded guilty to a crime prior to IIRIRA's passage. IIRIRA eliminated the ability of an alien to plead guilty to certain crimes yet retain the right to seek relief from deportation. Analyzing the retroactive application of this particular IIRIRA provision as mandated in Landgraf v. USI Film Products, 511 U.S. 244 (1994), the Court first determined that Congress' intent to make the provision preventing deportation relief for aliens who pleaded guilty to certain crimes retroactive was not sufficiently clear. See St. Cyr, 533 U.S. at ___, 121 S. Ct. at 2290.

Because Congress' retroactive intent was not clearly expressed, the Court then examined Landgraf's second factor, "whether the new provision attaches new legal consequences to events completed before its enactment." St. Cyr, 533 U.S. at ___, 121 S. Ct. at 2290 (quoting Landgraf, 511 U.S. at 270) (citation omitted). The Court noted that plea agreements involve a quid pro quo between criminal defendants and the government. See id. at 2291. By entering a guilty plea, St. Cyr waived several of his constitutional rights, including the right to a trial. As a result of that decision, the government also received "numerous 'tangible benefits, such as promptly imposed punishment without the expenditure of

-8-

prosecutorial resources.'" Id. (citation omitted).  Additionally, the Court noted that aliens like St. Cyr considered immigration implications when entering into plea agreements.  See id.  Because Congress' retroactive intent was not clear and the retroactive application attached a new legal consequence to St. Cyr, the Court refused to retroactively apply IIRIRA's provision making aliens who plead guilty to certain crimes ineligible as a matter of law for deportation relief.

St. Cyr does not support Petitioners' position.  This court has upheld the notion that Congress intended to retroactively apply the stop-time provision as announced by the Board in In re Nolasco-Tofino, Int. Dec. 3385 (BIA 1999).  See Rivera-Jimenez v. INS, 214 F.3d 1213, 1217 (10th Cir. 2000).  Our sister circuits agree that Congress intended the stop-time provision to apply retroactively. See, e.g., Pinho v. INS, 249 F.3d 183, 187 (3d Cir. 2001); Ram v. INS, 243 F.3d 510, 515-16 (9th Cir. 2001); Rojas-Reyes v. INS, 235 F.3d 115,121 (2d Cir. 2000); Ashki v. INS, 233 F.3d 913, 918 (6th Cir. 2000); Afolayan v. INS, 219 F.3d 784, 787-88 (8th Cir. 2000).  Furthermore, during oral argument Petitioners conceded that they could not distinguish their case from our prior decision in Rivera regarding the retroactive effect of the stop-time rule.

Even if we could accept Petitioners' view of IIRIRA's ambiguity, the right Petitioners allege they gave up in dependence on pre-IIRIRA provisions does not rise to the level Landgraf requires as interpreted by St. Cyr.  Petitioners assert

that they gave up the right to depart voluntarily from the United States in return for the opportunity to apply for suspension of deportation proceedings. Because IIRIRA's changes made Petitioners ineligible for suspension of deportation as a matter of law, Petitioners argue that the retroactive application of the stop-time rule costs them not only the opportunity to apply for discretionary review but also causes them to forfeit many of the advantages of voluntary departure. Those advantages include the right to depart to a country of the aliens' choice and the right to apply to reenter the United States legally.

Assuming, without deciding, that the right to apply for a discretionary grant of suspension of deportation rises to the level of a constitutional right commensurate with the right to a jury trial, Petitioners' argument suffers from a greater flaw. Unlike the petitioner in St. Cyr, Petitioners fail to show what the government gained from Petitioners' decision to forego the voluntary departure "right" granted to them. In fact, Petitioners' failure to voluntarily depart as promised has put the government to greater expense. Additionally, on at least four occasions Petitioners have been granted the opportunity to voluntarily depart from the United States. Yet, Petitioners have failed to take advantage of this opportunity on any occasion. We simply cannot agree with Petitioners that St. Cyr mandates departure from IIRIRA's unambiguous provisions.

Petitioners originally entered the United States with the authorization to

-10-

remain until November 1988. Through a variety of legal maneuvers and a combination of unusual circumstances, Petitioners remain in the United States more than thirteen years later. We recognize that the record is devoid of any evidence that Petitioners' conduct while in the United States has been anything less than commendable. However, the immigration laws must apply to all aliens, not just to those who disqualify themselves through boorish behavior or criminal misconduct.

The passage of the stop-time rule was Congress' solution to the very problem this court addresses today. Congress intended to prevent aliens from continuing to accumulate time toward the continuous residency requirement after INS had issued an order to show cause to an alien. We hold as a matter of law that Petitioners are ineligible to apply for suspension of deportation proceedings because they failed to accumulate the requisite seven years of continuous residence. Accordingly, we affirm the Board's denial of Petitioners' motion to reopen.

**AFFIRMED**.