RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0316P (6th Cir.)
File Name: 03a0316p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

RICARDO PACHECO
SUASSUNA,

*Petitioner,*

No. 02-3084

*v.*

IMMIGRATION AND
NATURALIZATION SERVICE,
*Respondent.*

On Appeal from the Board of Immigration Appeals.
No. A28 495 407.

Argued: August 7, 2003

Decided and Filed: September 4, 2003

Before: KEITH and COLE, Circuit Judges; WEBER,
District Judge.[*]

---

[*]The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

## COUNSEL

**ARGUED:** Marshal E. Hyman, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for Petitioner. Margaret J. Perry, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent. **ON BRIEF:** Marshal E. Hyman, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for Petitioner. Margaret J. Perry, Mark C. Walters, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent.

## OPINION

DAMON J. KEITH, Circuit Judge. Petitioner Ricardo Pacheco Suassuna appeals the denial of his application for suspension of deportation. For the reasons set forth below, we **AFFIRM** the judgment of the Board of Immigration Appeals.

### I. BACKGROUND

Suassuna was born on January 27, 1958, in Brazil. He entered the United States as a non-immigrant visitor on December 11, 1986. He was authorized to remain until May of 1987. On July 1, 1987, Suassuna's status changed to that of a non-immigrant student, authorizing him to remain as long as he was in school. On January 15, 1988, Suassuna married Carol Kadoura, a United States citizen. Suassuna and Kadoura have a son named Hamza Suassuna, who was born in Ypsilanti, Michigan on December 14, 1988. Shortly after Hamza was born, Ricardo Suassuna stopped going to school and started working. Suassuna and Kadoura were divorced

on January 2, 1992. Since April 9, 1993, Suassuna has had sole physical custody and joint legal custody of Hamza.

On July 18, 1991, the United States Immigration and Naturalization Service (INS) initiated deportation proceedings against Suassuna by serving him with a notice of hearing and order to show cause. The INS charged Suassuna with violating the conditions of his student status. On February 25, 1992, Suassuna appeared with counsel and admitted that he was deportable as charged. The immigration judge (IJ) found Suassuna deportable on the basis of his admission and ordered him to be deported to Brazil. The IJ granted Suassuna the privilege of voluntary departure at his own expense in lieu of forced deportation. Suassuna remained in the United States.

On August 20, 1996, Suassuna moved to reopen his deportation proceeding to apply for suspension of deportation and an extension of his prior grant of voluntary departure. Under then-existing law, an alien was eligible for suspension of deportation if he could show (1) that he had been continually physically present in the United States for seven years preceding his application for relief, and (2) that his deportation would cause "extreme hardship" to himself or to a United States citizen spouse, parent, or child. *See* former § 244(a) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254(a) (1994). This relief was not available if the alien had failed to comply with a prior grant of voluntary departure and was unable to show "exceptional circumstances" excusing his failure to depart. *See* former § 242B(e)(2)(A) of the INA, 8 U.S.C. § 1252b(e)(2)(A) (1994).

While Suassuna's motion to reopen the proceeding was pending, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (IIRIRA). IIRIRA created a "stop-time rule" terminating the continuity of an alien's physical presence for purposes of relief from deportation upon service

of the charging document commencing deportation proceedings. INA § 240A(d), 8 U.S.C. § 1229b(d). On October 31, 1996, an IJ issued an order reopening Suassuna's deportation proceedings to permit him to apply for suspension of deportation. The INS moved to pretermit Suassuna's pending suspension application in light of the stop-time rule. On February 27, 1998, the IJ granted the INS's motion and reinstated Suassuna's order of deportation.

Suassuna filed for reconsideration, arguing that the IJ should not have applied the stop-time rule and seeking reinstatement of the order of voluntary departure based on ineffective assistance of counsel. The IJ denied reconsideration. She found that Suassuna was undeserving of reinstatement of voluntary departure, because he had shown by his conduct that he was unwilling to leave the country voluntarily. The IJ was not persuaded by Suassuna's ineffective assistance argument.

Suassuna filed a timely appeal with the Board of Immigration Appeals (BIA). He argued that the IJ erred in applying the stop-time rule. Suassuna also argued that his counsel's ineffectiveness and Suassuna's desire to remain in the United States to obtain custody of his son were "compelling reasons" excusing his failure to depart and warranted reinstatement of voluntary departure.

On December 26, 2001, the BIA issued a written decision affirming in part and reversing in part the IJ's decision. The BIA applied the stop-time rule to Suassuna's pending suspension application and found him ineligible for a suspension because he lacked seven years of continuous physical presence prior to service of the order to show cause. The BIA affirmed that Suassuna was subject to deportation. However, with respect to Suassuna's request for reinstatement of voluntary departure, the BIA reversed the decision of the IJ finding that Suassuna had demonstrated "compelling reasons" for voluntary departure. The "compelling reasons" cited by the BIA focused on various errors made by

Suassuna's first lawyer. The BIA's decision permitted Suassuna the privilege of leaving voluntarily within thirty days (or any further extensions granted by the INS), but required that Suassuna be deported if he failed to leave voluntarily.

Suassuna filed this timely appeal. The sole issue before this Court is whether the stop-time rule applies to Suassuna.

## II. DISCUSSION

### A. Standard of Review

In reviewing the BIA's construction of immigration statutes, we proceed deferentially, setting aside the BIA's reasonable construction if it defies the plain language of the statute or is arbitrary or capricious. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). Other questions of law are reviewed *de novo*. *See Bartoszewska-Zajac v. INS*, 237 F.3d 710, 712 (6th Cir. 2001); *Ashki v. INS*, 233 F.3d 913, 917 (6th Cir. 2000).

### B. Analysis

The stop-time rule changed the method for calculating an alien's period of continuous physical presence in this country for purposes of qualifying for discretionary relief from a deportation order. It provides that "any period of . . . continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a)." INA § 240A(d), 8 U.S.C. § 1229b(d). Prior to the enactment of the stop-time rule, aliens would often delay their deportation proceedings until they accrued sufficient continuous presence in the United States to qualify for relief. *See* H.R. Rep. 104-879 (1997); *see also Bartoszewska-Zajac*, 237 F.3d at 713. By terminating the accrual of continuous physical presence upon service of the charging document, the stop-time provision of IIRIRA

eliminated an alien's incentive to delay his deportation proceedings.

Suassuna was served a notice of hearing and order to show cause on July 18, 1991. At that time, Suassuna had been in the United States for less than five years. The parties, therefore, agree that if the stop-time rule is applied to Suassuna, he lacks the seven years of continuous physical presence in the United States required for a suspension of deportation under the former § 244(a) or the current § 240 of the INA.

IIRIRA explicitly provided that most of its changes would not apply to aliens with deportation proceedings already pending at the time the statute went into effect. *See* IIRIRA, § 309(c)(1). However, one of the changes that does apply retroactively is the stop-time rule. Section 309(c)(1) states that § 240A(d) (the stop-time rule) "shall apply to notices to appear issued before, on, or after the date of enactment of this Act [September 30, 1996]." *See Ashki*, 233 F.3d at 918-19. This clause created some incongruity, because prior to April 1, 1997, the INS initiated deportation proceedings by service of an order to show cause, and not a notice to appear. Congress attempted to clear up this lingering confusion in 1997 when it enacted the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2160 (1997) (NACARA). Section 203(a)(1) of NACARA provides that § 240A(d) of the INA "shall apply to orders to show cause" issued before, on, or after the effective date of NACARA. Sitting en banc in 1999, the BIA held that the stop-time rule applies to all pending deportation proceedings unless the alien satisfies one of several statutory exemptions. *See In re Nolasco-Tofino*, 1999 WL 261565 (BIA 1999) (en banc).

Courts are generally reluctant to apply statutes retroactively. *See Bartoszewska-Zajac*, 237 F.3d at 712. "Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity

will generally coincide with legislative and public expectations." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994). However, this judicial presumption against retroactivity can be overcome when Congress clearly intends that result. *Id.* at 272-73. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." *Id.* at 280. If Congress has not expressly prescribed the proper reach of the statute, courts then consider whether retroactive application of the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

Applying these principles from *Landgraf*, we held in *Bartoszewska-Zajac* that the stop-time statute was unambiguous and "Congress plainly intended that the stop-time section of [IIRIRA] be retroactive, excepting it from otherwise forward-looking provisions." 237 F.3d at 712; *see also Ashki*, 233 F.3d at 918 ("Congress clearly indicated that the new 'stop time' provision applies retroactively to orders to show cause."). After our decisions in *Ashki* and *Bartoszewska-Zajac*, in *Sad v. INS*, 246 F.3d 811, 813 (6th Cir. 2001), a panel of this Court concluded that the stop-time rule was ambiguous. This finding contradicts the holdings of our prior decisions. However, we are bound by our decisions in *Ashki* and *Bartoszewska-Zajac*. *See Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001) ("[W]hen a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case."). Moreover, we agree, based on our reading of the IIRIRA stop-time rule and NACARA, with these prior decisions that Congress clearly intended to apply this provision retroactively.

We hold today that, for purposes of determining eligibility for suspension of deportation in cases that were pending as of

April 1, 1997, the law of the Circuit is that the alien's period of continuous physical presence ends upon service of the order to show cause, even if such order was issued prior to the enactment of the stop-time rule.

Suassuna, nevertheless, maintains that the stop-time rule should not apply to him. He makes three points in support of this claim. First, he argues that because he received ineffective assistance from his first lawyer, he is entitled to a new suspension of deportation hearing under the law as it existed at the time of the ineffective assistance.

The statute governing our jurisdiction to review an order of deportation requires the exhaustion of administrative remedies. *See* former Section 106(c) of the INA, 8 U.S.C. § 1105a(c) (1994) ("An order of deportation . . . shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations."); *see also Dokic v. INS*, 899 F.3d 530 (6th Cir. 1999). Suassuna's claim that the stop-time rule should not apply to him because of the ineffective assistance he received from his first lawyer was not raised before the BIA. Therefore, we lack jurisdiction to review this claim.

Suassuna's second argument is that the stop-time rule does not apply to cases in which a final administrative decision was issued before September 30, 1996. Suassuna urges us to hold that §§ 309(c)(1) and (c)(3) of IIRIRA limit § 309(c)(5)'s application of the stop-time rule to cases that had not yet culminated in a final administrative decision on the date of IIRIRA's enactment. Contrary to Suassuna's contention that this is an issue of first impression, we confronted a similar situation in *Ashki*. In that case, we affirmed the BIA's application of the stop-time rule even though a final deportation order had been issued in 1987. *Ashki*, 233 F.3d at 916.

Suassuna cites *Koliada v. INS*, 259 F.3d 482 (6th Cir. 2001), for the proposition that the transitional rules of IIRIRA apply only if a final order had not been entered before September 30, 1996. Suassuna's reliance on *Koliada* is misplaced. That case construed a transitional rule of judicial review in § 309(c)(4) of IIRIRA, not the stop-time rule from § 309(c)(5) that applies here.

We see nothing in §§ 309(c)(1) and (c)(3) that limits the application of the transitional stop-time rule of § 309(c)(5). There is no language anywhere in § 309 to suggest that pending deportation cases are treated differently if a final administrative order was once issued. Congress clearly intended the transitional stop-time rule to apply to aliens in deportation proceedings pending as of the effective date of IIRIRA, regardless of whether a final administrative order was ever issued in the case.

Suassuna's third and final argument is that recent cases call for a re-examination of whether the stop-time rule applies retroactively. Suassuna claims that *INS v. St. Cyr*, 533 U.S. 289 (2001), and *Bejjani v. INS*, 271 F.3d 670 (6th Cir. 2001), cast doubt on our earlier decisions in this area of law. As noted above, the reasoning in these cases cast some doubt on the method of analysis used in *Sad*, but we do not agree that these cases require us to abandon our other prior decisions.

The alien in *St. Cyr* was a lawful permanent resident who pled guilty to a felony pursuant to a plea bargain after living in the United States for more than seven years. *See St. Cyr*, 533 U.S. at 292-93. Removal proceedings were initiated against St. Cyr. Under the law in effect at the time of St. Cyr's plea, he was eligible for discretionary relief from deportation. However, under the new provisions of IIRIRA, he was not eligible for discretionary relief. *See* IIRIRA § 304(b). The Supreme Court held that it was impermissibly "retroactive" to eliminate this relief for aliens "whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible

for [discretionary relief] at the time of their plea under the law then in effect." *St. Cyr*, 533 U.S. at 293. Applying *Landgraf*, the Court found that Congress did not clearly intend that § 304(b) apply retroactively. *Id.* at 320. Proceeding to the second step of the *Landgraf* analysis, the Court concluded that applying the statute retroactively would impermissibly impair vested rights. *Id.* at 325. The Court noted that a plea bargain, which involves giving up important constitutional rights, is likely to be predicated on the assumption that the alien would be eligible for discretionary relief from deportation. *Id.* at 322.

*St. Cyr* is distinguishable from the present case. Unlike the provision of IIRIRA considered in *St. Cyr*, the stop-time provision was clearly intended to apply retroactively. *See Bartoszewska-Zajac*, 237 F.3d at 712. Thus, as noted above, *St. Cyr* does not cast doubt on this finding. We join our sister circuits that have considered whether the stop-time rule is impermissibly retroactive after *St. Cyr* in concluding that it is not. *See Jimenez-Angeles v. Ashcroft*, 2002 WL 1023103, at *4-*5 (9th Cir. 2002); *Sibanda v. INS*, 282 F.3d 1330, 1334-36 (10th Cir. 2002).

We also find *Bejjani* distinguishable. In that case, we refused to apply the automatic reinstatement of removal provision of § 241(a)(5) of the INA, 8 U.S.C. § 1231(a)(5), to aliens who illegally reentered the United States prior to the effective date of IIRIRA. The court in *Bejjani* found "clear congressional intent that § 241(a)(5) should not apply retroactively to reinstate prior orders of removal of aliens who reentered the country prior to the effective date of § 241(a)(5)." *Bejjani*, 271 F.3d at 687. *Bejjani* is distinguishable from the present case because Congress clearly intended that the stop-time rule apply retroactively, whereas, in *Bejjani*, Congress's intent regarding retroactivity was unclear. *See Bartoszewska-Zajac*, 237 F.3d at 712.

## III.  CONCLUSION

For these reasons, the judgment of the Board of Immigration Appeals is **AFFIRMED**.