NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0440n.06

No. 09-4127

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LEONARD BURGAJ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF |
| | ) | AN ORDER OF THE BOARD OF |
| ERIC H. HOLDER, JR., Attorney General, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

**FILED**

**Jun 30, 2011**

LEONARD GREEN, Clerk

Before: BOGGS, GRIFFIN, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Leonard Burgaj petitions for review of an order of the Board of Immigration Appeals denying his applications for asylum and withholding of removal, and finding that Burgaj waived his claim for relief under the Convention Against Torture. We dismiss the petition in part for lack of jurisdiction and deny the remainder.

I.

Burgaj, a native and citizen of Albania, applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") on October 12, 2004, alleging that he had been persecuted for his anti-communist political beliefs. He testified to the following facts during his direct examination at a 2007 immigration hearing.

In 1985, Burgaj's older brother, Lec, illegally departed from Albania in order to escape the communist regime. Lec had informed his parents of his plans to leave, but they did not believe him. They repeatedly visited government offices to ask about Lec's whereabouts after his departure. Government officials told them only that Lec had escaped from the country and was therefore a traitor. The officials ordered Burgaj's parents to stop their inquiries, and thereafter beat Burgaj's mother when she refused to comply. She became ill as a result of the government's actions, and was hospitalized for three months in early 1987. Although she felt better when she returned home from the hospital, she died suddenly a few days later. The family believed that the government had injected her with some type of poison in the hospital, which caused her death.

In 2003, when he was 25 years old, Burgaj began investigating his mother's death. [A.R. 194-95] He visited the hospital and questioned the doctor who administered the mysterious injection. He also visited a member of the Albanian parliament to inquire about the death. The politician told him to go home and threatened to beat him if he returned with questions about his mother. [A.R. 195-96] When Burgaj left the politician's office, two men in black uniforms approached and threatened to kill him if he continued asking about his mother's death. [A.R. 196]

Burgaj's father advised him to leave Albania after these encounters. Burgaj did so two or three months later, on April 13 or 15, 2004, and traveled through Greece, Germany, France, Spain, and Mexico, before entering the United States without inspection on May 26, 2004. [A.R. 183-84, 203] He testified that he feared returning to Albania because some people visited his father's house around 2006 and asked if Burgaj planned to continue researching his mother's death. [A.R. 204]

On cross-examination, Burgaj supplemented his testimony by adding that the two men in black uniforms beat him—in addition to threatening him—as he left the politician's office in 2003. He also stated that he had reviewed his original asylum application and two amended applications line by line with an interpreter, and that everything in the documents was true. [A.R. 205-06] Although the first two applications mentioned being beaten by the men in black, the third application omitted that fact. [A.R. 232-33] None of the applications mentioned that Burgaj had been threatened by a member of parliament. [A.R. 230-32]

Burgaj's older brothers, Lec and Alex, also testified at the hearing. Lec testified that he left Albania in July 1985—without telling his parents of his plans to leave—and entered the United States. [A.R. 258] He testified that he contacted his family in March 1986 and informed them of his location. [A.R. 266-67] He also testified that his mother was generally very healthy, and that he had received a letter from his father in March 1987, stating that his mother was in very good health. [A.R. 268] In contrast, Alex testified that his mother was diagnosed with heart disease three months before her death and had other health problems throughout her life. [A.R. 277] He also testified that the whole family knew of Lec's plans to leave Albania prior to his departure, and that Lec had probably told his parents of those plans. [A.R. 283] After Lec's departure, he said, his parents were ordered to report to government offices periodically because the government wanted them to admit that Lec was a traitor. [A.R. 285]

The Immigration Judge ("IJ") denied Burgaj's request for asylum, withholding of removal, and CAT relief. The IJ found the asylum application time-barred because Burgaj did not prove that it was filed within a year of his entry into the United States. The IJ also determined that Burgaj

could not meet his burdens of proof for withholding of removal or CAT relief because his testimony was not credible. Specifically, the IJ found that Burgaj and his brothers gave conflicting accounts of Burgaj's arrival in the United States, Lec's departure from Albania, and the circumstances of their mother's death. He also found that parts of Burgaj's testimony—relating to the politician's threats and the beating by two assailants outside government offices—were inconsistent with his written applications. Based on these findings, the IJ determined that Burgaj had fabricated parts of his asylum claim, and found the application frivolous.

The Board of Immigration Appeals affirmed all but the finding that Burgaj's asylum application was frivolous. The Board agreed that the asylum application was untimely. It also found that the IJ's adverse-credibility finding was not clearly erroneous because "[t]he record contain[ed] material inconsistencies regarding the heart of the respondent's claim, namely his brother Lec's departure from Albania, and [Burgaj's] investigation of the circumstances surrounding the death of his mother." In the alternative, the Board stated that Burgaj had failed to show past persecution or a well-founded fear of future persecution, nor had he demonstrated a nexus between the alleged beating or threats and his political opinion or social group. The Board found that Burgaj had waived his request for CAT relief by failing to press that claim on appeal. In addition, the Board denied a motion to remand for consideration of additional evidence—namely, documents relating to the mother's death and the family's political involvement, and materials from Alex's and Lec's asylum proceedings—because the evidence was immaterial, previously available, and unreliable.

Burgaj timely petitioned for review.

II.

Although we review the Board's decision as the final agency determination, we also review the IJ's decision to the extent the Board relied on his reasoning. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review questions of law de novo and factual findings—including credibility determinations—for substantial evidence, reversing only if the evidence presented compels a contrary conclusion. *See id.*

Burgaj argues that the Board erred in finding his asylum application untimely. But we lack jurisdiction to review untimeliness determinations unless the petitioner raises a question of constitutional law or statutory interpretation. *See* 8 U.S.C. § 1158(a)(2)(B), (a)(3); 8 U.S.C. § 1252(a)(2)(D); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). Burgaj does neither here: he asserts that the Board should have accepted his testimony as sufficient evidence of his time, place, and manner of entry into the United States. These are fact issues. We lack jurisdiction over this claim. *See Almuhtaseb*, 453 F.3d at 748.

Next, Burgaj argues that the IJ and the Board erred in denying his withholding-of-removal application. To prevail on a withholding claim, Burgaj must demonstrate a "clear probability" that he would be persecuted in Albania on the basis of his political opinion or social group. *See* 8 U.S.C. § 1231(b)(3); *Liti v. Gonzales*, 411 F.3d 631, 640-41 (6th Cir. 2005). The IJ concluded that Burgaj did not meet this burden because it found his testimony incredible. That finding must be supported by specific inconsistencies that go to the heart of an applicant's claim. *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).

Several inconsistencies cited by the Board go to the heart of Burgaj's claim. First, Burgaj and his brothers gave contradictory testimony about whether their parents knew that Lec planned to leave Albania. Alex testified that everyone knew of Lec's plans to leave. Lec testified that his parents did not know where he was until he had settled in the United States, several months after leaving Albania. Burgaj testified that his parents did not know what happened to Lec, so they repeatedly sought information on his whereabouts from the communist government. According to Burgaj, the government mistreated his parents during these encounters, which led to his mother's hospitalization and murder.

Under either brother's version, it is implausible that the parents repeatedly sought information from the government. According to Lec, the parents knew of his location long before his mother's hospitalization in early 1987, so there was no need to seek additional information from the government. Moreover, if the parents knew of their son's illegal escape from the country, as Alex testified, they would not have called the government's attention to that fact by seeking more information. In contrast, Burgaj's version of events—in which the parents knew nothing of Lec's departure and provoked government officials by seeking information—enhances the likelihood that his mother fell ill from mistreatment and died under suspicious circumstances, an essential part of the withholding claim.

The next inconsistency relates to the circumstances of Burgaj's mother's death. Alex testified that his mother had various health problems and was hospitalized for heart disease three months before she died. This testimony suggests that her death was neither sudden nor suspicious, meaning that Burgaj would not have been motivated to investigate nearly 20 years after the fact.

Burgaj testified, however, that his mother was healthy in general and specifically before her sudden death.

Finally, Burgaj's testimony differed from his written applications in significant ways with respect to his investigation of his mother's death. Key inconsistencies between an asylum application and an applicant's oral testimony may be sufficient to support an adverse-credibility finding. *See Singh v. Ashcroft*, 398 F.3d 396, 402-03 (6th Cir. 2005). Here, Burgaj testified that a member of the Albanian parliament threatened to harm him when he inquired about the death. But his first two asylum applications fail to mention any interaction with a politician. His third application mentions a meeting with a politician—the "Deputet in Shkoder"—but does not describe being threatened. Burgaj also was inconsistent in describing whether the two men in black uniforms physically attacked him when he left the politician's office. He initially testified that the men had merely threatened him. On cross examination, however, he added that the men also had beaten him. Burgaj's asylum applications are similarly inconsistent on this point: the first two applications mention a beating, but the third does not. Burgaj blamed his counsel for the omitted material in his third application. This excuse is unconvincing, however, because Burgaj swore that he had reviewed the application line by line and that it contained correct information. This inconsistency is significant, because the beating is the only physical harm alleged by Burgaj that could possibly support a finding of persecution.

Burgaj blames these inconsistencies on the fact that he and his brothers were young—between nine and eighteen years old—at the time of their mother's death, and therefore could not remember exact details. But this court may not reverse the Board simply because we

might have decided the issue differently. *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001). The IJ and the Board knew the brothers were young at the time of their mother's death, but still found Burgaj not credible. The record does not compel us to reverse this finding. Burgaj therefore cannot meet his burden for withholding of removal.

Burgaj also argues that he should have been granted CAT relief and that he qualifies for humanitarian asylum. We lack jurisdiction to consider his argument as to the CAT, because it was not properly presented to the Board. *See Lin v. Holder*, 565 F.3d 971, 978 (6th Cir. 2009). And we lack jurisdiction to consider Burgaj's argument as to humanitarian asylum, because he raises it for the first time on appeal. *Id.*; *see also Suassuna v. INS*, 342 F.3d 578, 583 (6th Cir. 2003).

Finally, Burgaj argues that the Board erred in failing to remand for consideration of new evidence. We review the Board's denial of motions to remand for an abuse of discretion, asking if the denial "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *Sarr v. Gonzales*, 485 F.3d 354, 363 (6th Cir. 2007). The Board did not abuse its discretion here, because some of Burgaj's "new" evidence was previously available and other evidence—such as a copy of Lec's permanent-resident card—was not material. *See id.*; 8 C.F.R. § 1003.2(c)(1).

We dismiss the petition to the extent it challenges the denial of Burgaj's applications for asylum, CAT relief, and humanitarian asylum, and we deny the remainder.